# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# BEAUMONT DIVISION

| | |
|---|---|
| DALLIE MILLER, | Case No. 1:20-cv-00010 |
| Plaintiff, | |
| v. | **FIRST AMENDED COMPLAINT** |
| DAYBREAK VENTURE, L.L.C., and PINEHURST NURSING AND REHABILITATION, LP | JURY TRIAL DEMANDED |
| Defendants. | |

## FIRST AMENDED COMPLAINT

Plaintiff Dallie Miller ("Plaintiff" or "Miller"), for her First Amended Complaint against Pinehurst Nursing and Rehabilitation, LP ("Pinehurst") and Daybreak Venture, L.L.C. ("Daybreak"), alleges as follows:

1. This action is brought by Miller arising from Pinehurst's retaliating against her in response to her investigations and efforts to stop Pinehurst's and Daybreak's false and fraudulent statements, reports and claims for payment that Pinehurst, Daybreak and their affiliated companies routinely and intentionally submitted to the United States Government. Plaintiff files this Complaint against Defendants pursuant to the anti-retaliation provision of the federal False Claims Act, 31 U.S.C. §§ 3730(h), to recover damages for wrongful retaliation, and alleges as follows:

## I. JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

3. This Court has personal jurisdiction and venue over Defendant pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a). Jurisdiction is proper over the Defendant because the Defendant can be found in, resides in, and/or has transacted business within this Court's jurisdiction, and some of the acts in violation of 31 U.S.C. § 3729 occurred within this district.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b) & (c) and 31 U.S.C. § 3732(a) because Defendant resides in or transacts business in this district and because a substantial portion of the events or omissions giving rise to the claims alleged herein occurred in this district. Plaintiff is familiar with Defendant's fraudulent practices alleged in this Complaint and is aware that the pervasive misconduct at issue occurred in this District.

## II. PARTIES

5. Plaintiff Dallie Miller is a former employee of Pinehurst, and a citizen and resident of Orange, Orange County, Texas.

6. Defendant Pinehurst Nursing and Rehabilitation, LP ("Pinehurst") is a limited partnership registered and doing business in Texas. It owns and operates Pinehurst Nursing & Rehabilitation facility, 3000 Cardinal Street, West Orange, Orange County Texas.

7. Defendant Daybreak Venture, LLC ("Daybreak") is a limited liability company incorporated and doing business in Texas. It is the general partner of Pinehurst. Its registered address is 419 S. Elm Street, Denton, TX 76201. It has appeared in this case.

## III. FACTS

**A. Daybreak's Corporate Integrity Agreement with the OIG**

8. Daybreak Partners, LLC, is a holding company for a number of subsidiaries (including Pinehurst) that operate and manage skilled nursing facilities throughout Texas. The skilled nursing facilities are operated as individual limited partnerships owned by Defendant Daybreak Venture, LLC and Daybreak Healthcare, Inc. Daybreak Venture, LLC is the general partner of Pinehurst.

9. In October 2016, Daybreak Partners, LLC; Daybreak Venture, LLC; and the United States Department of Justice agreed to settle a False Claims Act case alleging Daybreak improperly billed Medicare and Medicaid between 2006 and 2010.

10. As part of the settlement, Daybreak paid $5.3 million and signed a Corporate Integrity Agreement ("CIA") with the Office of Inspector General for Health & Human Services ("OIG"). The CIA applies to any long term care facility in which Daybreak has an ownership or control interest and any long term care facility managed by Daybreak; this includes Pinehurst. The CIA allows the OIG to oversee the quality of care provided at all of Daybreak's skilled nursing facilities from 2016 through 2021, and requires Daybreak to have an independent monitor. The CIA (Section III(A)(4), at page 11) requires "Certifying Employees"—defined to include the Director of Nursing ("DON") and Administrator of each of Daybreak's long term care facilities (including Pinehurst)—to sign a certification as follows:

**DAYBREAK**
**CORPORATE INTEGRITY AGREEMENT (C.I.A.)**
**CERTIFYING STATEMENT**

I have been trained on and understand the compliance requirements and responsibilities as they relate to the Director of Nursing Clinical Operational Division, an area under my supervision. My job responsibilities include ensuring compliance with regard to the Director of Nursing Clinical Operational Division, , with all applicable federal health care program requirements, obligations of the Corporate Integrity Agreement, professionally recognized Standard of healthcare, and Daybreak Venture, LLC (Daybreak) policies and procedures. I have taken steps to promote such compliance. To the best of my knowledge, except as

3

otherwise described herein, the Director of Nursing Clinical Operational Division of Daybreak is in compliance with all applicable Federal health care program requirements, the obligation of the Corporate Integrity Agreement, and professionally recognized standards of healthcare. I understand that this certification is being provided to and relied upon by the United States.

If I am unable to provide such a certification, I must provide a written explanation of the Reasons why I am unable to provide the certification outlined above.

I understand that it is my responsibility to disclose to Daybreak any knowledge I have about a known or suspected Compliance violation or integrity issue ("Disclosable Issue"**) involving Daybreak, or any of its affiliated companies, subsidiaries, employees, and/or contractors.

11. As the DON at Daybreak's Pinehurst facility, Miller was required to sign this compliance certification statement.

**B.    Miller's Employment at Daybreak**

12. Miller originally began working for Pinehurst in West Orange, Orange County Texas in December 2017 as Pinehurst's Assistant Director of Nursing ("ADON") and MDS Coordinator. As MDS Coordinator, Miller formulated and implemented individual care plans for nursing home residents. She was also obligated to ensure compliance with Medicare requirements and ethical standards, and was familiar with Medicare billing obligations.

13. After a merger, Daybreak had two MDS Coordinators and terminated Miller's position in May 2018 because it did not need 2 MDS Coordinators.

14. After being away from Pinehurst for two or three months, Daybreak's Regional Director of Clinical Services, Valerie Thomas, visited Miller at her house and asked her to come back to work at Pinehurst again with a promotion and raise. Miller rejoined Pinehurst on August 28, 2019 as the DON at Daybreak's Pinehurst location.

15. Miller's performance at Pinehurst was excellent, as evidenced by Valerie Thomas personally coming to Miller's house and asking her to rejoin Pinehurst with a pay raise and

promotion from ADON to DON. She routinely received compliments from her supervisors, her patients, and the family members of her patients. Miller was never given an unsatisfactory review or written up for any deficiencies or misconduct.

16.     On October 16, 2019, Miller's ADON (Naomi Gonzales) met with Miller in her office to review Valerie Thomas's facility visit report. During that meeting Valerie Thomas stated that Miller and Gonzales were a "dream team," and that she stated she "loved" and was really impressed with the progress Miller was making with the Pinehurst facility.

17.     Miller's salary was $80,000 per year, plus benefits. Her benefits included Blue Cross Blue Shield medical insurance dental and vision insurance, life insurance, disability insurance, illness and accident insurance, and a legal shield plan with identity theft insurance.

**C.     Daybreak and Pinehurst Engage in Unnecessary Genetic Testing**

18.     On September 26, 2019, Miller met with Bobby Baker, the President and CEO of Patient Care Partners, a genetic testing vendor, to discuss having genetic testing performed on all of Daybreak's patients.

19.     Baker and Valerie Thomas were advocating performing these genetic tests (which were unnecessary) in order to increase revenue generated from Medicare. Ms. Thomas had a disagreement with Dr. Kristopher Gabas Dela Cruz (the medical director of Pinehurst), about working with Patient Care Partners to perform these unnecessary genetic tests on the Pinehurst residents.

20.     The OIG has recognized that billing Medicare for unnecessary genetic testing has become a problem. *See* oig.hhs.gov/fraud/consumeralerts/alerts/geneticscam.asp.

21.     Valerie Thomas signed orders to conduct genetic testing on at least 16 residents of Pinehurst despite a lack of medical necessity for the genetic testing.

22. For example, Thomas signed an order to conduct genetic testing on Patient #1,[1] a woman on hospice who was almost 90 years old and had no need for genetic testing. Patient #1 was not under the care of Dr. Kristopher Gabas Dela Cruz (the medical director of Pinehurst). She was admitted to Pinehurst under the care of Dr. Michael Nancy Amsden of Southeast Texas Hospice and her physician never approved genetic testing. Patient #1's daughter complained to Miller about Patient #1 being given unnecessary genetic testing.

23. Thomas (as authorized agent for Dr. Dela Cruz) targeted the genetic testing to Pinehurst's Medicare Part A patients (because Medicare Part A reimbursed for genetic testing) and not Medicaid or Medicare Part B patients (because Medicaid and Medicare Part B did not reimburse for it.) She authorized the genetic testing for 16 Medicare Part A patients (including Patient #1), where the genetic testing was not necessary, and billed Medicare for it.

24. Bobby Baker asked Miller, as DON of the Pinehurst facility, to sign an agent letter authorizing the genetic testing, but Miller refused because it was not medically necessary. Thomas signed the letter authorizing the testing after Miller refused.

**D.    Daybreak and Pinehurst Engage in False Billing Regarding Plan of Care Meetings**

25. Miller learned that from May 2019 through the end of August 2019 (when she was not working for Pinehurst), the facility was not conducting the required quarterly Plan of Care ("POC") meetings.

26. Each patient file includes a notation of the date of the most recent POC meeting and she could see that multiple patients had gone more than 3 months without a POC meeting.

---

[1] Patient names are identified in a confidential exhibit that will be provided separately to Defendant in order to protect patient confidentiality.

6

27. Regular POC meetings are important because Daybreak and Pinehurst bill Medicare for holding them and because they are required in order to ensure that patients are properly cared for and that their needs are being regularly reevaluated.

28. She also noted that patient's initial care plans, created at the time of their admission, were incomplete. She found inadequate Significant Change in Condition Plans ("SCIC Plans") including for Patient #2, who was having multiple injuries from repeated falls. She saw that Patient #2 was also not being properly administered his medications and a lack of discussion in his POC regarding his medications (e.g., whether the plan was to continue the medications, taper him off his medications, or reevaluate his medications for effectiveness.)

29. Miller noted that Pinehurst's Plans of Care and other documentation were grossly inadequate and that Daybreak and Pinehurst were falsely billing Medicare for these patients, as well as providing them with unnecessary services.

E. **Miller Opposes Violation of False Claims Act Regarding Unnecessary Genetic Testing and Lack of POC Meetings**

30. On October 16, 2019, Miller complained about Defendants' Medicare fraud. During the Plan of Care meeting, she complained about Defendants ordering unnecessary genetic testing.

31. At that meeting, she also complained that Pinehurst was misrepresenting that it had the required quarterly POC meetings with patients and caregivers to discuss and evaluate the POC and determine whether changes were needed.

32. At the October 16, 2019 meeting, Miller complained that several patients had not had POC meetings in the past 3 months, as was required.

33. For example, Miller complained that the most recent POC for Patient #1 was dated 3/8/2019, demonstrating a lack of a POC meeting for more than seven months.

34. As another example, Miller complained that the most recent POC for Patient #2 was dated 5/25/2019, demonstrating a lack of a POC meeting for almost five months.

35. Miller complained that the most recent POC for Patient #3 was dated 6/8/2019, demonstrating a lack of a POC meeting for more than four months.

36. Miller complained that the most recent POC for Patient #4 was dated 6/7/2019, demonstrating a lack of a POC meeting for more than four months.

37. Miller complained that Defendant's MDS coordinator repeatedly attested to Medicare that these quarterly POC meetings were taking place and billed for preparing and re-evaluating a POC for each resident on a quarterly basis, and that these representations were false.

38. Miller brought this deficiency to the attention of Valerie Thomas and Cathy Dugas, the Administrator, on October 15 and 16, 2019, and told them that Defendants were authorizing unnecessary genetic tests and making false statements to the Government about these quarterly meetings taking place, and falsely certifying that the patient's medical requirements were being re-evaluated every three months as required.

**F.     Pinehurst's Termination of Miller**

39. Miller was terminated the day after she complained about the fraudulent practices described above.

40. On Thursday, October 17, 2019, Miller was called into the Administrator's office at 2:00 pm, prior to her next scheduled Plan Of Care meeting. Both Valerie Thomas and Cathy Dugas stated they had to terminate her employment. Miller asked why and they said they could not tell her why.

**G.     Miller's Experience After Termination**

41. After Pinehurst terminated Miller, she experienced severe mental anguish and emotional distress. She was devastated after having worked hard to achieve her goals, to be terminated for insisting on abiding by Daybreak's signed CIA with the Department of Justice.

42. She worried daily about her precious patients being mistreated, abused, and neglected after working so hard to turn her facility around.

43. She became depressed and afraid to continue pursuing her dream of becoming a DON again for fear of retaliation if she opposes fraudulent behavior again.

44. Because Miller lives in Orange, a small town, she was concerned that Valerie Thomas could damage her future employment opportunities. Thomas is well known in the Orange area and frequently bragged about her close friendships with persons in power in the industry including the local state inspector. Miller also fears Ms. Thomas will seek to cause Miller to lose her nursing license.

45. Despite actively seeking employment, Miller was unable to get another job at the level of DON or equivalent and was unable to find any full-time work in the nursing field.

46. She was unable to find any work until November 11, 2019, when she got a job as a dialysis nurse at DaVita. Her position as dialysis nurse is significantly lower than her position as a Director of Nursing at Pinehurst, is part-time, and pays less.

47. Before the termination, she had a full-time salaried position as a DON, earning $80,000 per year, plus benefits, at Pinehurst. Although she would like to work full time, DaVita only gives her 28 hours of work per week. Her pay is $34 per hour. Her weekly pay has gone down about 40%, from about $1,600 per week to $952 per week.

H.   **Fraud on the Federal Government**

48. Miller had good reason to believe that Daybreak and Pinehurst were participating in fraud on the Medicare system, as described above.

9

49. Defendant's ongoing scheme violates the federal False Claims Act because (as stated above) they knowingly submitted false information in order to obtain payments from the United States Treasury.

50. Defendant violated the False Claims Act by knowingly, or with a reckless disregard for the truth, causing the submission of false or fraudulent claims; for making, using or causing to be made or used false records or statements material to false or fraudulent claims; for making, using, or causing to be made or used false records or statements material to avoid obligations to pay or transmit money to the Government, and/or for knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the Government, including, but not limited to the submission of false or fraudulent statements regarding the services provided to the residents of the Pinehurst facility.

51. Defendant further concealed their wrongful conduct by directing employees to omit, falsify, or otherwise materially alter information regarding necessity for genetic testing, Plans of Care, and other key information regarding residents of the Pinehurst facility.

### IV.    RETALIATION CLAIM

52. Miller was terminated by Pinehurst, on October 17, 2019, in retaliation for her activity in trying to stop Daybreak's and Pinehurst's fraud on the federal government, including her most prominent complaints on October 16, 2019.

53. Miller's salary at the time of her termination was $80,000 per year.

54. As described above, Miller engaged in protected activity when she investigated and opposed the fraudulent nature of Defendant's schemes to obtain money from the Government in the form of Medicare payments.

55. Specifically, Miller opposed Defendant's practice of making fraudulent representations to CMS in order to ensure that Defendant continued to receive federal Medicare funds, which practice could reasonably lead to a viable claim under the FCA and demonstrated a distinct possibility of FCA litigation.

56. Miller's actions were motivated by her good faith belief that Defendant was committing fraud against the United States.

57. Defendant was on notice that Miller was investigating and opposing the fraud as evidenced by Miller's statements during the meeting the day before she was terminated. These statements put Defendant on notice that litigation was a reasonable possibility.

58. Defendant retaliated against Miller by terminating her employment in retaliation for protected activities including investigating and opposing fraudulent practices by Defendant.

59. Defendant's termination of Miller was motivated by her protected activity described in this Complaint. Their termination happened the day after the protected activity and the protected activity is the only possible cause of her terminations, as she was otherwise recognized as doing an excellent job.

60. Defendant's retaliation and discrimination inflicted damages on Miller, including, but not limited to, past and future earnings, lost employment benefits (including health insurance benefits and retirement contributions), job-search expenses, humiliation, mental anguish, emotional distress, and litigation costs.

## V.     THE FALSE CLAIMS ACT

61. The False Claims Act imposes liability on any person who--

 (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); . . . or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government..."

31 U.S.C.A. § 3729 (a)(1)(A-G).

62. The term "claim" includes "any request or demand, whether under a contract or otherwise, for money . . . that—

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . .

31 U.S.C.A. § 3729 (a)(2).

63. The Relief from Retaliatory Actions provision of the False Claims Act states:

(1) In general.
Any employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

(2) Relief.
Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for

> the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. . .

31 U.S.C.A. § 3730(h).

## VI.  CAUSES OF ACTION

### COUNT ONE

### RETALIATORY DISCHARGE UNDER THE FALSE CLAIMS ACT, 31 U.S.C. §3730(h)

64. All paragraphs of this Complaint are incorporated herein by reference.

65. Plaintiff engaged in protected activity when she investigated and reported the fraudulent nature of Defendant's schemes.

66. Plaintiff's actions were aimed at matters that reasonably could lead to a viable claim under the FCA and/or demonstrated a distinct possibility of FCA litigation.

67. Plaintiff's actions were motivated by her good faith belief that Defendant was committing fraud against the United States.

68. Defendant was on notice that Plaintiff was investigating the fraud as evidenced by her multiple conversations wherein she complained about these fraudulent practices, including statements she made the day before she was terminated.  These conversations put Defendant on notice that litigation was a reasonable possibility.

69. Defendant retaliated against Plaintiff by terminating her employment in retaliation for protected activities including investigating and opposing fraudulent practices by Defendant in violation of the anti-retaliation provisions of the FCA, 31 U.S.C. § 3730(h).

70. Defendant's termination of Plaintiff was motivated by Plaintiff's protected activity described in this Complaint.  Defendant's termination of Plaintiff happened the day after the protected activity and the protected activity is the only possible cause of the termination of Plaintiff, as she was otherwise recognized as doing an excellent job.

71. Defendant's retaliation and termination inflicted damages on Plaintiff, including lost income, lost employment benefits, job search expenses, mental anguish and emotional distress.

72. Pursuant to 31 USC §3730(h)(2), Plaintiff is entitled to two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees, past and future earnings, lost employment benefits (including health insurance benefits and retirement contributions), job-search expenses, damages for humiliation, mental anguish, and emotional distress, pre and post-judgment interest, litigation costs and attorneys' fees, and any other relief that this Court deems appropriate, all collectively in an amount to be determined at trial.

## PRAYER

WHEREFORE, Plaintiff prays for the following relief:

1. Two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees, past and future earnings, lost employment benefits (including health insurance benefits and retirement contributions), job-search expenses, damages for humiliation, mental anguish, and emotional distress, pre and post-judgment interest, litigation costs and attorneys' fees, and any other relief that this Court deems appropriate, all collectively in an amount to be determined at trial;

2. An award to Plaintiff pursuant to 31 U.S.C. §3730(d) of reasonable attorneys' fees, costs, and expenses; and

3. Such other relief as the Court deems just and equitable.

## **JURY DEMAND**

Plaintiff hereby demand a jury trial on all issues triable to a jury.


Dated: April 28, 2020

                                                      Respectfully submitted,

                                                      /s/ Cory S. Fein
                                                      Cory S. Fein
                                                      Cory Fein Law Firm
                                                      712 Main Street, Suite 800
                                                      Houston, TX 77002
                                                      (281) 254-7717
                                                      (530) 748 - 0601 (fax)
                                                      cory@coryfeinlaw.com


                                                      *For Plaintiff Dallie Miller*